IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:18CR270-LO |
| ) | |
| EDWIN ANYAOKU, ) | Hon. Liam O'Grady |
| ) | |
| Defendant ) | |

### DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF JURISDICTION AND IMPROPER VENUE

COMES NOW the Defendant, Edwin Anyaoku, by and through counsel, and respectfully moves this Honorable Court to dismiss the Indictment for lack of federal jurisdiction and improper venue.

### INTRODUCTION

While drug cases are routine on a federal court's docket, there are none quite like this one: a case linked to the United States solely by virtue of a government agent's concocted story that drugs purchased overseas would eventually be sold in New York—a tale designed to manufacture American jurisdiction. As a result of the government's contrivances, Mr. Anyaoku was imprisoned in South Africa for one year awaiting extradition and set foot in the United States for the first time to answer to this Indictment.

There is no question that Mr. Anyaoku arranged to sell heroin to a confidential source (CS) who, unbeknownst to Mr. Anyaoku, was working with the Drug Enforcement Agency (DEA). Mr. Anyaoku made the arrangement with the CS in South Africa, which is the proper forum for this prosecution. Entirely for the purpose

of manufacturing American jurisdiction, the CS stated to Mr. Anyaoku—after they had struck a deal to exchange drugs for money—that the drugs would be going to New York. Mr. Anyaoku has never been to the United States, never intended to sell drugs in the United States, and has never imported drugs into the United States. Mr. Anyaoku may have to pay a price for his conduct. But he should pay that price by answering to charges in South Africa alongside his two alleged accomplices.

Constitutional due process and federal jurisdiction require that Mr. Anyaoku's conduct have a greater nexus to the United States than that which the CS manufactured here. Even if not, venue in this district is improper because the CS stated to Mr. Anyaoku that the drugs would be sold in New York, not Virginia.

## STATEMENT OF FACTS

Mr. Anyaoku is 54 years old and was born in Nigeria. Prior to his arrest, he had been living in Johannesburg, South Africa for 25 years. He is married and has four children. He has never been arrested anywhere or traveled to the United States. He had neither previously imported drugs into the United States nor ever had any intent to import drugs into the United States.

In March and December 2017, the CS contacted an alleged heroin trafficker living in Belgium. During that time, the alleged trafficker introduced the CS to Mr. Anyaoku. The CS asked Mr. Anyaoku to sell him heroin when the CS visited South Africa. The CS never identified himself as an American and explicitly sought heroin *in South Africa*. Mr. Anyaoku allegedly agreed to and ultimately did sell the CS one kilogram of heroin in December 2017 in South Africa.

They later agreed to meet again. In the course of their recorded conversations—*after* the terms of the first deal were struck—the CS stated that the heroin would be sold in New York:

> CS: I send it to Suriname.
> EA: Okay.
> CS: And from Suriname, we send it to New York
> EA: Okay.

After this initial exchange about New York, the CS brought up New York several times, for example:

> CS: Uh, next time you wanna put something I'll bring it to, to . . . uh, all the way to New York.
> EA: Okay.

Later, the CS developed a detailed story involving New York and invited Mr. Anyaoku to profit from sales in New York. Mr. Anyaoku agreed to the CS's fictional plan but never demonstrated that he could at all assist in importing drugs into the United States. Before the CS injected "New York" into the conversation, Mr. Anyaoku never expressed any interest in where the drugs should be distributed or offered any assistance in importing drugs into the United States.

On June 19, 2018, law enforcement arrested Mr. Anyaoku at the scene of the second staged drug buy in South Africa with 29 kilograms of heroin. He was imprisoned in South Africa for over one year awaiting extradition, which he did not challenge.

The government charged Mr. Anyaoku with conspiring to distribute heroin and distributing heroin with the knowledge that the heroin would be imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a), 963, and 18 U.S.C. § 2.

ARGUMENT

I. THE MANUFACTURED JURISDICTION DOCTRINE MANDATES DISMISSAL OF THE INDICTMENT.

　　A.　The CS Wedged "New York" Into His Conversation with Mr. Anyaoku To Manufacture Federal Jurisdiction.

"[T]he manufactured jurisdiction doctrine . . . prohibits the government from 'manipulat[ing] events to create federal jurisdiction over a case.'" *United States v. Davis*, 855 F.3d 587, 589 (4th Cir.) (quoting *United States v. Al-Talib*, 55 F.3d 923, 929 (4th Cir. 1995)), *cert. denied*, 138 S. Ct. 268 (2017). Its origin in federal criminal law is *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), in which the Second Circuit overturned a Travel Act conviction because federal agents provoked interstate phone calls to "set up a federal crime, [going] beyond any proper prosecutorial role and needlessly inject[ing] the Federal Government into a matter of state concern." *Id.* at 672.

Following *Archer*, the Fourth Circuit has adopted and applied the manufactured jurisdiction doctrine in multiple contexts. For example, it reversed a Hobbs Act conviction for which the only interstate commerce was federal agents moving gambling machines across state lines to create a fake gambling parlor in a sting operation. *United States v. Brantley*, 777 F.2d 159, 163 (4th Cir. 1985). Notably, the Court found it legally significant that "[i]t was **wholly unnecessary** for the FBI to move gambling equipment from Virginia to South Carolina[.]" *Id.* (emphasis added). "[T]he commercial predicate for federal jurisdiction can[not] be found in such pretense on the part of federal agents." *Id.* In other words, jurisdiction

4

is "manufactured" where "there was no legitimate explanation underlying . . . the government's actions." *See United States v. Brinkman*, 739 F.2d 977, 982 (4th Cir. 1984); *see also United States v. Cooper*, 1995 WL 44654, *1 (4th Cir. 1995) (rejecting manufactured jurisdiction where it is debatable why federal law enforcement took certain investigative steps); *United States v. Hillary*, 1988 WL 118652, *3 (4th Cir. 1988) (same).

Similarly in *United States v. Coates*, 949 F.2d 104 (4th Cir. 1991), the Fourth Circuit reversed a murder-for-hire conviction under 18 U.S.C. § 1958 because "the *only* reason the jurisdictional link occurred . . . was that it was contrived by the government for that reason alone." *Id.* at 106 (emphasis in original). Despite investigating Coates for a month, the government "had no evidence of his use of interstate mail or wire facilities in connection with the murder-for-hire scheme. To cure this problem, the government agent drove to Virginia for the sole purpose of making a telephone call across state lines in order to induce Coates to 'use' that interstate facility to discuss the scheme." *Id.* at 105.

Here, the CS's intent in wedging the words "New York" into his conversation with Mr. Anyaoku is clear: to secure American jurisdiction over Mr. Anyaoku's prosecution. It strains credulity to suggest it served any other investigative purposes because Mr. Anyaoku never inquired about the destination of the heroin he allegedly

5

sold. Nor did he ever take any action in furtherance of importing the heroin into the United States.[1]

### B. The CS Entrapped Mr. Anyaoku and Manufactured an Essential Element of the Charged Offenses.

"[T]he 'manufactured jurisdiction' concept is properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense . . . ; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous . . . ; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime." *United States v. Wallace*, 85 F.3d 1063, 1065-66 (2d Cir. 1996) (internal citations omitted).

Mr. Anyaoku raises the first and third theories. "To establish entrapment, a defendant must first demonstrate the government induced him to engage in the criminal activity. Once the defendant has shown government inducement, the burden shifts to the government to prove beyond a reasonable doubt the defendant's predisposition to have engaged in the criminal conduct." *United States v. Young*, 916 F.3d 368, 375-76 (4th Cir. 2019) (internal citation omitted). Here, the call recordings demonstrate that the CS induced Mr. Anyaoku's engagement in the criminal activity

---

[1] There is no dispute that the manufactured jurisdiction doctrine applies equally to federal efforts to apply criminal statutes to extraterritorial conduct. *See generally United States v. Al Kassar*, 660 F.3d 108, 120 (2d Cir. 2011).

6

of importing drugs into the United States. The government then lacks proof beyond a reasonable doubt that Mr. Anyaoku's was predisposed to assist in importing drugs into the United States. He never previously traveled to the United States or imported drugs into the United States.

The third theory is related. The government manufactured the element of 21 U.S.C. §§ 959(a), 960(a), 963, and 18 U.S.C. § 2 that requires Mr. Anyaoku know or have reason to know that the drugs he sold to the CS would be imported into the United States. Even where "the government initiates an essential element of a crime[]" under the third theory, "jurisdiction is not manufactured if the defendant 'then takes voluntary actions that implicate the [government-initiated] element.'" *United States v. Al Kassar*, 660 F.3d at 120 (quoting *United States v. Wallace*, 85 F.3d at 1066). In an importation case, this means that the defendant's subsequent "voluntary actions" must be "in furtherance of [a] conspiracy . . . targeting the United States[.]" *United States v. Flores*, No. S5 15 CR. 765 (PAC), 2017 WL 1133430, at *2 (S.D.N.Y. Mar. 24, 2017). For example, courts have found such subsequent voluntary actions when defendants: (1) actively conspired to harm Americans; (2) traveled to the United States in furtherance of the alleged offense; or (c) took other overt acts to facilitate the import of drugs into the United States. *See, e.g.*, *United States v. Al Kassar*, 660 F.3d at 120; *United States v. Lau Tung Lam*, 714 F.2d 209, 210–11 (2d Cir. 1983).

Here, the government lacks proof that Mr. Anyaoku took subsequent voluntary actions targeting the United States. When the CI brought up the fiction that drugs

7

would be sold in "New York," Mr. Anyaoku did little more than passively assent and express approval. *Cf. United States v. Jasmin*, 668 F. App'x 375, 377 (2d Cir. 2016) (voluntary action requirement satisfied by defendant's "rental of and travel to a hotel in New Jersey on May 1, 2012 to discuss the scheme with [a co-conspirator]"). He did absolutely nothing to demonstrate that he had been previously interested in selling drugs to the United States, let alone had the ability to import drugs from Johannesburg into the United States. *Cf. United States v. Lau Tung Lam*, 714 F.2d at 210–11 (finding jurisdiction not manufactured where "undercover federal agent inquire[d] whether a drug dealer, already distributing in [Europe], [wa]s interested in selling in the United States" and assisted the sale, because the dealer "committed the substantial jurisdictional act of bringing [the] drugs into the United States").

The government will surely argue that *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011), undermines Mr. Anyaoku's claim of manufactured jurisdiction, but that argument would be wrong. In *Al Kassar*, the defendants had been suspected of illegal arms trafficking by the U.S. government for decades and the DEA had sought to infiltrate the trafficking network with paid informants posing as members of a known terrorist organization. *See Al Kassar v. U.S.*, 07 CR 354, 2014 WL 1378772 (S.D.N.Y. 2014). The Second Circuit upheld the convictions of the non-U.S. citizen defendants for conspiring to sell arms to kill Americans, notwithstanding the defendants' argument that undercover DEA agents manufactured jurisdiction by approaching the defendants in the first place and telling them the arms would be used against Americans. *Id.* at 119. In rejecting the defendants' argument, the court

8

emphasized that evidence of the defendants' "positive reaction to the idea that the arms would be used to kill Americans . . . suggests a *predisposition* to support and participate in that goal." *Id.* at 119-20 (italics added). Additionally, the Second Circuit found that the defendants took extensive subsequent voluntary actions including "conspiring among themselves to acquire and sell these weapons to what they believed was a terrorist organization with knowledge that the weapons would be used to kill Americans." *Id.* at 120. Contrast *Al Kassar* with this case, where Mr. Anyaoku showed absolutely no predisposition to harm American interests prior to the CS mentioning the United States in order to manufacture jurisdiction.

The CS therefore manufactured the element of the charged offense that Mr. Anyaoku know or have reason to know that the drugs he sold would be imported into the United States. The government lacks any evidence that Mr. Anyaoku had prior intent to target the United States or that he took voluntary actions targeting the United States after the CS wedged "New York" into the conversation. The Court should dismiss the indictment. *See United States v. Coates*, 949 F.2d at 106.

### C. This Prosecution Also Violates Due Process.

Generally, "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if [s]he had been present at the effect, if the state should succeed in getting [her] within its power." *Strassheim v. Daily*, 221 U.S. 280, 285 (1911) (Holmes, J.). "Though a criminal statute having extraterritorial reach is declared or conceded substantively valid under the Constitution, its enforcement in a particular instance

9

must comport with due process. Some courts have, as a proxy for due process, required a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012) (internal quotation marks omitted). This Court has observed, "Congress may clearly express its intent to reach extraterritorial conduct, but a due process analysis must be undertaken to ensure that Congress' reach does not exceed its constitutional grasp." *United States v. Shahani Jahromi*, 286 F. Supp. 2d 723, 727 (E.D. Va. 2003) (Ellis, J.) (finding that due process was not violated by application of United States law on a United States citizen living overseas).

Here, the government's prosecution of a local South African drug dealer in United States courts is emblematic of one that exceeds Congress's constitutional grasp. The government bases federal jurisdiction solely on the statements of a CS that serve to manufacture an essential element of the charges offenses. That tenuous jurisdiction cannot substitute as a nexus between Mr. Anyaoku and the United States. DEA agents initially targeted Mr. Anyaoku based on vague, unsubstantiated information that he could procure drugs *in South Africa*. Mr. Anyaoku is a man of modest means who had never before exported drugs outside of South Africa. Because he agreed to a fictional plan that he had no ability to carry out, he has been flown across the world, and imprisoned thousands of miles from his family and support system. If he is convicted of this offense, he faces a ten-year mandatory prison term, which he will serve at United States taxpayers' expense, thousands of miles from where he committed the offense. And for what? Agreeing to participate in a staged

crime that would never harm the United States, the critical jurisdictional element of which was entirely manufactured by the DEA. The Court should therefore dismiss the indictment as violating Mr. Anyaoku's due process rights.

## II.  VENUE IN THIS DISTRICT IS IMPROPER.

Even if the CS did not manufacture jurisdiction, the proper venue is New York and not this district. Proper venue in a criminal prosecution is a constitutional right. *United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000), *cert. denied*, 532 U.S. 944 (2001). "The trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." Art. III, § 2, cl. 3." The right to a trial in the jurisdiction where the crime was committed is reinforced by the Sixth Amendment, which provides a defendant a right to a trial by a "jury of the State and district wherein the crime shall have been committed." *Id.* at amend VI.

Venue is "proper only in a district in which an essential conduct element of the offense took place." *United States v. Smith*, 452 F.3d 323, 334–35 (4th Cir. 2006). "[T]he government must prove by a preponderance of the evidence that defendant committed the act constituting the essential conduct element of the crime in the charged district." *United States v. Mallory*, 337 F. Supp. 3d 621, 627 (E.D. Va. 2018) (citing *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012)); *accord United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323, 328 (4th Cir. 2012) (non-conduct elements are "circumstance elements," which, "even if essential, are of no moment to a venue determination").

11

This limitation on venue to the place where an essential conduct element took place applies with equal force in conspiracy cases. Indeed, while "in a conspiracy charge, venue is proper for all defendants wherever the agreement was made or wherever any overt act in furtherance of the conspiracy transpires," *see United States v. Bowens*, 224 F.3d at 311 n.4, such overt acts must still relate to the essential conduct elements of the applicable offense to make venue proper. *See United States v. Anyakoha*, 188 F.3d 503 (4th Cir. 1999) (unpublished) ("[T]here was no evidence that a co-conspirator possessed the heroin in the Eastern District of Virginia, so Anyakoha's possession conviction cannot be based on an aider and abettor theory.")

Here, no essential conduct elements of the three charged counts occurred in this district. Instead, the only possible United States venue for this Indictment is in New York, where the CS told Mr. Anyaoku the drugs would be sold. The government went to great lengths to manufacture a purported story that Mr. Anyaoku's drugs would be sold in New York—perhaps because they thought that a relatively unsophisticated local drug trafficker might be enticed by the idea of "New York." To be sure, it would be far less compelling to make up a story that the drugs would be sold in Loudon or Fairfax Counties because the average South African has probably never heard of those places. The government cannot have it both ways: if it wants to use New York as a hook to bring Mr. Anyaoku into the United States for prosecution, it must bring and try the case in New York. *See United States v. Muhammad,* 502 F.3d 646, 655 (7th Cir. 2007) (venue proper in Wisconsin where drugs were seized in Texas but bound for Wisconsin).

The "first brought" venue statute, 18 U.S.C. § 3238, does not command a different result. Under § 3238, venue is proper "in the district in which the offender . . . is arrested or first brought" for "all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district . . . ." Section 3238 further requires that the defendant commit all essential conduct elements abroad. *See, e.g.*, *United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986) (no venue under § 3238 if "crucial activity would have occurred in the District of Columbia" rather than in Canada and Pakistan); *United States v. Mallory*, 337 F. Supp. 3d at 633 (for § 3238 to govern, "the essential criminal conduct" must be "committed outside of the jurisdiction of any state"); *see also Travis v. United States*, 364 U.S. 631, 634 (1961) ("[V]enue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of a tribunal favorable to it." (internal quotation marks omitted)).

Here, the government alleges that an essential conduct element of the charged offenses occurred in New York: Mr. Anyaoku knew or should have known that the heroin he allegedly sold to the CS would be imported into New York. On that basis, the only appropriate venue for this prosecution lies in New York and not this District. *See United States v. Levy Auto Parts*, 787 F.2d 946, 952. The Court therefore should transfer the indictment to a venue in the Southern District of New York.

## CONCLUSION

For the reasons stated herein, this Indictment should be dismissed for lack of jurisdiction and improper venue.

13

Respectfully submitted,

By counsel

_____/s/_____
Elizabeth Mullin
Va. Bar. No. 86668
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
(703) 600-0880 (fax)
Elizabeth_Mullin@fd.org


Geoffrey Derrick
AKIN GUMP STRAUSS HAUER & FELD L.L.P.
2001 K Street N.W.
Washington, DC 20006
Telephone: (202) 887-4597
Facsimile: (202) 887-4288
Email: gderrick@akingump.com

## **CERTIFICATE OF SERVICE**

      I certify that on September 27, 2019 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sends a notification of such filing to all counsel of record.

                                        /s/
                                        Elizabeth Mullin
                                        VA Bar No. 86668