IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:18-CR-270 |
| EDWIN ANYAOKU,<br>a.k.a. "Mark," | Hon. Liam O'Grady |
| *Defendant*. | Hearing: October 25, 2019 |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS FOR LACK OF JURISDICTION AND IMPROPER VENUE

The United States, by and through undersigned counsel, hereby submits its opposition to defendant Edwin Anyaoku's Motion to Dismiss for Lack of Jurisdiction and Improper Venue. ECF Nos. 29, 31.  The defendant seeks to dismiss the indictment based on the idea that although the defendant was more than willing to send drugs to the United States—even offering to travel here himself to receive the proceeds—the government improperly "manufactured" jurisdiction, thereby entrapping the defendant and violating his due process rights.  Alternatively, the defendant asserts that the Eastern District of Virginia is the improper venue for this case, and he should be prosecuted in New York because although no part of his conduct constituting the offense occurred there, he understood that the heroin he was trafficking eventually would be imported into New York.  Both arguments fail, and the defendant's motion should be denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a Drug Enforcement Administration (DEA) investigation into heroin traffickers in Africa and Europe.  In that part of the world, heroin typically originates in Pakistan or Afghanistan, then travels south through the southern part of Africa before being smuggled elsewhere around the world.  This investigation involved the use of a confidential source (CS) who was at all times acting at the direction and under the supervision of DEA agents.

In 2017, the CS was in communication with a heroin trafficker living in Belgium.  During this time, the trafficker in Belgium introduced the CS to the defendant as one of the Belgium-based trafficker's criminal associates.  In October 2017, the CS called the defendant to tell him that the CS was making arrangements to travel to Johannesburg, where the defendant resided, in order to purchase heroin from the defendant.

In early December 2017, the CS reached out to the defendant and asked if the defendant would have "chocolate" (code for heroin) for the CS when he came to Johannesburg to meet; the defendant confirmed that he would.  The CS reached out again several days later, at which time the CS and the defendant agreed that the cost per kilogram would be $15,000 in U.S. currency.

On December 16, 2017, the CS told the defendant that the CS would be in Johannesburg on Friday (December 19), and would have the money to purchase heroin.  The defendant told the CS that he would be ready.

On December 19, the defendant met with the CS and told him that the heroin would be ready the next day.  It was at that point that the CS told the defendant that the heroin would travel through Suriname and ultimately be imported into the United States in New York, making it clear that the success of this transaction was tied to the resale of heroin in the United States.  Thereafter,

2

the CS told the defendant that he (the defendant) could invest in a subsequent, larger load of heroin, which could be sold for $60,000 per kilogram in New York.  The defendant responded that he would "love" that.  The defendant confirmed that his sources could supply larger quantities of heroin for subsequent purchases.

In the same conversation, the defendant assured the CS that the heroin was of good quality, and the two continued to discuss a subsequent load of heroin.  The CS told the defendant that, if the defendant wanted to invest in a future load, the CS could either bring the proceeds to the defendant in Johannesburg or give the proceeds to any associates the defendant might have in the United States.  The CS even offered to bring drug proceeds to Colombia or Brazil, but the defendant cut him off and said no, the defendant had "a nephew in America.  He can go anywhere." The CS responded, "Oh, okay.  So I give it to him over there [in the United States]," and the defendant responded, "Yeah, yeah, I fly out and come there."  From the outset, this subsequent transaction involved the distribution of heroin for importation into, and resale within, the United States.  To suggest that the CS "wedged" the idea of sending drugs to the United States into an otherwise completely foreign transaction is simply inaccurate.

The following day, the defendant provided the CS with just over one kilogram of heroin in exchange for $15,000, the agreed-upon price.  The defendant gave the CS back $200 as an apology for the delay.

In January 2018, the CS called the defendant again and told him that the CS was gathering money for a purchase of 23 to 24 kilograms of cocaine.  The defendant and the CS negotiated prices for a pending deal, which ultimately materialized in June 2018.

In early June 2018, the CS reached out to the defendant again to tell him that the CS would be coming back to Johannesburg later that month with enough money to buy 27 kilograms of heroin. The two agreed to meet again on June 19.

On June 19, 2018, the CS met the defendant at a hotel in Johannesburg around lunchtime. The defendant advised that he would bring a total of 29 kilograms of heroin, and that two of the kilograms would belong to the defendant as his investment. During the conversation, the following exchange occurred:

CS:        So they're gonna bring the stuff [heroin], everything they're going to bring it to Sierra Leone. From Sierra Leone will bring it to Conakry [Guinea] because Conakry has direct containers to…

Defendant:    To U.S.A.

CS:        To New York. Yeah.

The CS agreed to pay the defendant $14,000 per kilogram for the 27 kilograms. The CS agreed to sell the defendant's personal two kilograms for $67,000 each in New York, and charge the defendant $9,000 per kilogram for a transportation fee; thus, the defendant expected to realize a net profit of $58,000 per kilogram in the sale. The defendant agreed to bring the heroin to the same hotel later that afternoon, around 4:00 pm.

Then, around 4:00 pm, as the defendant and the CS had planned, the defendant and his two accomplices showed up to the hotel with all 29 kilograms of heroin, which the defendant intended to be imported into the United States through New York. The defendant was more than willing to send heroin to the United States, and indeed, took several affirmative steps to effect that outcome. As the courts have recognized, the government has a legitimate interest in identifying and

prosecuting foreign drug traffickers willing to send narcotics to the United States for redistribution. As such, the defendant's motion to dismiss is meritless and should be denied.

## II.     ANALYSIS

### A.  The Government Did Not "Manufacture" U.S. Jurisdiction

The "manufactured jurisdiction" doctrine that the defendant invokes, which originated with the case of *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), does not apply to his case. *Archer* addressed the Travel Act, 18 U.S.C. § 1952(a)(3), which in relevant part prohibits the use of a facility in interstate or foreign commerce to promote unlawful activity.  In *Archer*, as well as in *United States v. Brantley*, 777 F.2d 159 (4th Cir. 1985), and *United States v. Coates*, 949 F.2d 104 (4th Cir. 1991), the Fourth Circuit cases adopting the manufactured jurisdiction doctrine, law enforcement agents manipulated instrumentalities of the offenses (telephones, or an undercover gambling parlor) that were entirely outside of the defendants' control in order to transform state offenses into federal ones.

Here, by contrast, the defendant argues that the government "manufactured" an American crime by having the CS initiate the *idea* that the drugs would be sent to the United States.  Mot. at 5.  The extraterritorial drug trafficking statutes under which the defendant has been charged, 21 U.S.C. §§ 959 and 963, require proof that the defendant knew, intended, or had reasonable cause to believe that the controlled substances at issue would be imported into the United States.  21 U.S.C. § 959(a).  This element—a defendant's knowledge of a United States nexus—is entirely within defendant's control.  As a result, the defendant asks this Court to dismiss the indictment against him based on the theory that simply because a government source told him that the drugs

would end up in the United States, the government manufactured his state of mind out of whole cloth.  This is not the scenario the "manufactured jurisdiction" doctrine is designed to reach.

The defendant correctly anticipates that the government will argue that *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011), undermines the defendant's claim of manufactured jurisdiction, Mot. at 8, because that is precisely what it does.  *Al Kassar* succinctly explains that "if the government unilaterally supplies an essential element of a crime, the government has in effect failed to prove that element as to the defendant"; however, "jurisdiction is not manufactured if the defendant then takes *voluntary actions that implicate the government-initiated element*." *Id.* at 120 (emphasis added).

Incredibly, the defendant argues that the government "lacks any evidence that" the defendant "took voluntary actions targeting the United States after the CS wedged 'New York' into the conversation." Mot. at 8.  This argument is belied by the defendant's actions after the CS told him that the heroin would be imported into New York.  The CS first told the defendant that the heroin would be imported into the United States on December 19, 2017.  Thereafter, the defendant took *several* voluntary actions in furtherance of the conspiracy, including but not limited to the following:

- In the same conversation on December 19, offered to sell the CS larger quantities of heroin;

- In the same conversation, offered to have his nephew, who lived in the United States, receive drug proceeds from the CS;

- In the same conversation, offered to personally travel to the United States to pick up drug proceeds;

- On the following day, distributed a kilogram of heroin to the CS in exchange for $15,000;

6

- In January 2018, negotiated a deal with the CS for a significantly larger load of heroin, which the defendant understood to be intended for the United States;

- In June 2018, invested in two of his own kilograms of heroin for the CS to sell in the United States at a profit that the defendant himself would realize;

- On June 19, 2018, negotiated prices and transportation costs for the heroin that he understood to be going to the United States;

- On the same day, recruited two accomplices to transport the heroin to the designated meeting spot at a hotel in Johannesburg; and

- On the same day, showed up at the meeting spot with his two accomplices and a total of 29 kilograms of heroin that he believed would be imported and sold into the United States.

The defendant never expressed any hesitation or reluctance to send drugs to the United States. To analogize this to a case in which law enforcement drove across state lines to place a phone call to a target to generate interstate use of communications facilities (*e.g., Archer* or *Coates*) is a bridge too far, at best.

Indeed, the very cases upon which the defendant relies undermine his argument. For example, the defendant cites *United States v. Flores*, No. S5 15 Cr. 765 (PAC), 2017 WL 1133430 (S.D.N.Y. Mar. 24, 2017) for the proposition that in drug importation cases, jurisdiction is *not* manufactured where the defendant takes subsequent voluntary actions in furtherance of a conspiracy targeting the United States. Mot. at 7 (quotations omitted). True enough. In *Flores*, the defendants moved for a new trial on cocaine importation charges based on several grounds, including the manufactured jurisdiction doctrine. As here, the defendants alleged that "references to the United States were unilaterally supplied by persons working on behalf of the Government, not the Defendants." *Flores*, 2017 WL 1133430, at *2 (quoting Defs.' Mot.). The court rejected this argument out of hand, explaining that "[e]ven if the government unilaterally introduced the

7

concept of targeting the United States, the unproved-element theory [manufactured jurisdiction] still would not apply here because Defendants subsequently took a number of voluntary actions in furtherance of the conspiracy." *Id*. Such voluntary actions included "continuing to meet and discuss the arrangement," bringing drugs to a meeting, involving accomplices, and negotiating deals. *Id*. As described above, these are precisely the kinds of voluntary actions the defendant undertook in this case after the CS represented to him that the heroin would be transported to New York. It is simply not the case that the government supplied the sole basis for the *mens rea* element of this offense.

The defendant would also contrast his case with that of *United States v. Lau Tung Lam*, 714 F.2d 209 (2d Cir. 1983). Mot. at 8. This, too, is unavailing. In *Lau Tung Lam*, as here, the defendant was a heroin trafficker who, to the best of the government's knowledge, had not previously expressed interested in selling heroin in the United States. *Id.* at 210. And, as here, a DEA informant approached the defendant and inquired about sending heroin to New York. *Id.* Unlike Mr. Anyaoku, however, the defendant in *Lau Tung Lam* expressed "some hesitation" before ultimately agreeing to participate in the scheme. Even so, the court recognized that "[t]he Government has an entirely legitimate interest in identifying and apprehending [foreign] drug dealers willing to bring narcotics to this country for sale," and rejected the defendant's attempt to extend the "carefully limited holding" of *Archer* to the extraterritorial drug trafficking context. *Id.* This court should do the same.

B. The Defendant Was Not "Entrapped" into Trafficking Heroin

Next, and relatedly, the defendant alleges that he was "entrapped" into trafficking thirty kilograms of heroin intended for the United States because (a) "[t]he government . . . lacks proof

beyond a reasonable doubt" that he was predisposed to commit the offense, or (b) the government "manufactured" the element of the defendant's intent.  Mot. at 7.  The latter argument is duplicative of the argument regarding the manufactured jurisdiction doctrine—right down to the idea that the CS "wedged" the U.S. nexus into the conversation.  *Compare* Mot. at 4 *to* Mot. at 9.  For the reasons set forth above, this argument is meritless, and the government will not retread the same ground.

As to the defendant's first theory of entrapment, however, the defense correctly cites the proposition that once the defendant has shown that the government induced him to engage in criminality, "the burden shifts to the government to prove beyond a reasonable doubt the defendant's predisposition to have engaged in the criminal conduct." *United States v. Young*, 916 F.3d 368, 375–76 (4th Cir. 2019) (citing *United States v. Jones*, 976 F.2d 176, 179 (4th Cir. 1992)). What the defense neglects to mention is that entrapment is an affirmative defense raised at trial, not a basis to dismiss the indictment.  *United States v. Sligh*, 142 F.3d 761, 762 (4th Cir. 1998); *United States v. Kendrick*, 423 F.3d 803, 807 (8th Cir. 2005) ("As an affirmative defense, entrapment is a question of fact generally left to the jury") (internal citations omitted); *see also Mathews v. United States*, 485 U.S. 58, 62 (1988) (a defendant is entitled to an entrapment instruction at trial only where "there is sufficient evidence from which a reasonable jury could find entrapment.").  Thus, if there were evidence that the government entrapped the defendant into trafficking heroin to send to the United States, an entrapment defense provides no basis for dismissal of the indictment.  It should be raised at trial, if at all.

Moreover, even if an entrapment defense could provide a basis to dismiss the indictment, the defense also omits the corollary to the proposition set forth in *Young*, which is that

"[p]redisposition 'focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime.'" *Young*, 916 F.3d at 376 (quoting *Mathews*, 485 U.S. at 63).  The defendant concedes that he is a heroin trafficker, *see* Mot. at 1, and does not dispute that he had ready access to wholesale quantities of heroin for export from South Africa.  And, when the CS told the defendant that he would send the heroin to New York, the defendant expressed no hesitation or concern whatsoever.  To the contrary, the defendant said he would "love" to invest in a load of heroin going to the United States, and told the CS that he had a family member who could receive drug proceeds.  Even when the CS offered to send proceeds to South America, the defendant cut him off and said that he (the defendant) would travel to the United States to receive them.  It is simply not the case that the defendant was tricked, cajoled, or pressured to even a slight degree to directing a dangerous controlled substance to the United States.  To the contrary, the defendant was simply an "unwary" heroin trafficker who "readily availed himself of the opportunity" to turn a profit in the United States, one of the most lucrative drug markets in the world.  *Young*, 916 F.3d at 376.  The defendant was not entrapped, and even if there were some question that he was, the indictment should not be dismissed on this basis.

C.   <u>Prosecution in the United States Does Not Violate the Defendant's Due Process Rights</u>

The defendant also argues he cannot be tried in the United States consistent with the requirements of the Due Process Clause of the Fifth Amendment because there were insufficient intentional contacts with the United States to allow him to be fairly tried in the United States.  The defendant's argument fails because the charged offenses properly include jurisdiction over the defendant's conduct and his due process rights are not violated for prosecuting him for such crimes.

10

As noted above, the statutes for which he has been charged proscribe the distribution of controlled substances "knowing, intending, or having reasonable cause to believe" that they will be imported into the United States. 21 U.S.C. § 959(a).  Proof of that element alone would presumptively establish a sufficient link to the United States to comport with the Due Process Clause.  *See United States v. Ahmadi*, 765 F. App'x 254 (9th Cir. 2019) (citing *United States v. Medjuck*, 156 F.3d 916, 919 (9th Cir. 1998)).

The defendant, however, cites *United States v. Brehm*, 691 F.3d 547 (4th Cir. 2012), for the proposition that "[s]ome courts have, as a proxy for due process, requires a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair."  Mot. at 10 (quoting *Brehm*, 691 F.3d at 552).  Notably, the defense omits the outcome of *Brehm*, *see* 691 F.3d at 554, in which the Fourth Circuit affirmed the validity of the U.S. prosecution of a South African defendant accused of assaulting a British citizen on a NATO-operated military base in Afghanistan—a case implicating American interests far less directly than this one.

Nor does the defendant address the requirements of *Brehm* that the prosecution of an extraterritorial offense be neither "arbitrary" nor "fundamentally unfair."  *Id.* at 553.   That is because the prosecution of the defendant in the United States for trafficking in heroin he understood to be going to the United States is neither of those things.  This Court routinely sees defendants extradited for extraterritorial drug trafficking.  Furthermore, the Fourth Circuit has explained the fairness prong in this context:

> Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere.

*Id.* at 554 (quoting *Al Kassar*, 660 F.3d at 119) (emphasis in original).  The defendant reasonably should have been under a similar understanding when it came to trafficking in wholesale quantities of Pakistani heroin.  Heroin trafficking is self-evidently criminal, and the enthusiasm for sending such heroin to the United States that the defendant expressed should be sufficient to dispel any surprise that he could be brought to the United States to face charges for the same.

D.  Venue Properly Lies in the Eastern District of Virginia

Finally, the defendant argues that the case should be transferred to the Southern District of New York because that is where the CS told him the heroin would be imported.  At the outset, it should be noted that the CS never specified that he intended to send heroin to Manhattan rather than, say, Brooklyn, so even if transfer were appropriate, it's not clear which district in New York would be the appropriate transferee district.

Moreover, the defendant's claim that venue in this case properly lies in the Southern District of New York is contrary to the plain language of the federal venue statute, 18 U.S.C. § 3238, and lacks any legal support.

Section 959 makes it clear that the statute is designed to "reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States." 21 U.S.C. § 959(d). For purposes of section 959, it does not matter where in the United States a defendant knew, or intended, or had reasonable cause to believe that controlled substances would be imported, but rather that they would be imported into the United States at all.

Accordingly, the federal venue statute for extraterritorial offenses, 18 U.S.C. § 3238, controls.  That statute makes unequivocally clear that

> [t]he trial of all offenses begin or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, *shall be in the district* in which

12

> the offender, or any one or two or more joint offenders, *is arrested or is first brought*; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

*Id.* (emphasis added).  Accordingly, the statute provides that venue "shall be" in the "district" where the defendant is arrested or first brought.  The statute does not provide for venue in the district in which the defendant anticipated his drugs might end up.

And yet, the defendant wants to have it both ways: on the one hand, he asserts that he "has never been to the United States, never intended to sell drugs in the United States, and has never imported drugs into the United States."  Mot. at 2.  On the other hand, the defendant argues that an "essential conduct element" of the conduct alleged occurred in New York, thus mandating transfer to the Southern District of New York.  Mot. at 13.  This ignores the fact that section 959 itself makes it clear that it reaches conduct that, as in this case, is wholly extraterritorial.  The only link to New York is the defendant's understanding of the point of entry for the heroin he sold to the CS.  He cannot credibly claim that his state of mind gives rise to any actual conduct occurring in the Southern District of New York.

*United States v. Levy Auto Parts*, 787 F.2d 946 (4th Cir. 1986), is not to the contrary.  In fact, in *Levy Auto Parts*, the court found that "[s]ubstantial activity in the District of Columbia was contemplated, but *venue could not have been laid* in the District of Columbia *on the basis of contemplated activity which was frustrated before it began*." *Id.* at 952 (emphasis added).  Here, the conspiracy was completed before anything occurred in New York—again, because section 959(d) makes clear that such an offense is entirely extraterritorial and the venue requirements of section 3238 apply.  Because those requirements are met in this case, "the prosecution may proceed

13

in [this] district, notwithstanding the possibility that the gravamen of the wrongdoing took place elsewhere." *United States v. Smith*, 452 F.3d 323, 334 (4th Cir. 2006).  Venue is proper in the Eastern District of Virginia, and the motion to transfer venue to the Southern District of New York should be denied.

### III.   CONCLUSION

For the foregoing reasons, this Court has jurisdiction over the defendant's case; prosecution in the United States does not violate the defendant's due process rights, and venue is proper in the Eastern District of Virginia based on black letter statutory law.  The defendant's motion to dismiss the indictment for lack of jurisdiction and to transfer based on improper venue should be denied.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


_____/s/_____
Katherine E. Rumbaugh
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3982
Email: katherine.rumbaugh@usdoj.gov

14

CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of October 2019, I filed the foregoing with the Clerk

of Court using the CM/ECF system, which will automatically forward a notification of such filing

(NEF) to all counsel of record.


                                                      _____/s/_____
                                                      Katherine E. Rumbaugh
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:  703-299-3700
Fax: 703-299-3982
Email: katherine.rumbaugh@usdoj.gov