**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | **)** | |
| | **)** | |
| v. | **)** | **No. 1:18CR270** |
| | **)** | **Hon. Liam O'Grady** |
| | **)** | |
| EDWIN ANYAOKU | **)** | **Sentencing: March 20, 2020** |
| | **)** | |
| Defendant. | **)** | |
| | **)** | |

## DEFENDANT'S POSITION ON SENTENCING

Two years ago, Edwin Anyaoku was a man of modest means who co-leased a small shop in a low-income neighborhood in Johannesburg, South Africa. He was scraping by, barely making ends meet to support his wife of over 20 years and his four children, who range in age from 6 to 22 years old. By all accounts, he is a devoted and hardworking family man and a faithful parishioner of the Johannesburg-based Grace Church. Before his childhood friend introduced him to the confidential source in this case, Mr. Anyaoku had never imported drugs to the United States nor did he have the ability to do so. His friends and family describe Mr. Anyaoku as a "gentleman," a "man who lives for his family," humble," and "caring and kind at heart."[1]

There is no question that in June 2018, Mr. Anyaoku brought two suitcases of heroin to a hotel in Johannesburg, prepared to sell it to a man who, unbeknownst to

---

[1] Character Letters are attached hereto as Exhibit 1.

him, was a DEA confidential source (CS).  There is also no question that Mr. Anyaoku was motivated by a desire to make quick money.  He acknowledges that he should be punished for his crime.  To that end, he accepted responsibility from the beginning. He did not challenge extradition to the U.S. and he pleaded guilty well before trial. That said, Edwin Anyaoku is no drug kingpin.  He is no international drug trafficker. Indeed, he has no prior criminal convictions in any jurisdiction.  There is no evidence that prior to being introduced to the CS six months earlier, Mr. Anyaoku had ever been the target of any investigation into drug trafficking. Prior to his extradition on these charges, he had never set foot in the United States.

Mr. Anyaoku does not dispute that he exercised grievously bad judgment here. The CS laid a trap for him and—motivated by desperation and greed—he readily jumped into it.  In doing so, he devastated and shocked the family and community that believe in him.  Still, as the attached video testimonials and letters attest, his family and community stand by him and await his return with open arms.

Mr. Anyaoku has already paid dearly for his crime.  First, though he did not contest extradition, he was incarcerated for one year in one of South Africa's notoriously worst, inhumane prisons.  After his extradition paperwork was finally processed, he was brought to the United States where family cannot afford to visit him.  He is isolated, alone in a foreign country, with limited, sporadic telephone contact with his wife.  After he completes this Court's sentence, he will be transferred to Immigration and Customs Enforcement (ICE), and deported.

For the reasons that follow, a sentence of two years is sufficient but not greater than necessary to achieve the goals of sentencing.  While this request represents a significant variance from the PSR's guideline range, which the defense does not dispute, Mr. Anyaoku is not a typical international drug trafficking defendant.  This memo will lay out the reasons why a sentence of 24 months, in conjunction with the time spent in a horrific Johannesburg prison awaiting extradition, meets the goals of sentencing.

## I.    The Court has broad discretion to impose a sentence less stringent than the one suggested by the Guidelines.

Nearly twenty years after the Supreme Court's *United States v. Booker*, it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).  Courts must consider the Guideline range as just one of more than a half dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a).[2]

Indeed, as the Department of Justice acknowledges, determining the Guidelines range is no substitute for determining a sentence that is "appropriate [and] serve[s] the interests of justice." *See* Government's Supplemental and Amended

---

[2] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. § 3553(a).

Sentencing Memorandum, *United States v. Roger J. Stone, Jr.*, Case No. 19-cr-18-ABJ, ECF No. 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can be driven by sentencing enhancements that "overlap[] . . . with the offense conduct," and can therefore result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors).

Here, where Mr. Anyaoku's offense was not violent and he was neither a leader nor organizer, where he would not have committed the offense were it not for the intervention of the CS, where he has accepted responsibility, and where he has a history of legitimate work and commitment to family, a sentence within the guideline range would be excessive and unwarranted under the circumstances.

## II. Application of the sentencing factors

### A. Mr. Anyaoku's history and characteristics show that his offense was an aberration.

1. *Mr. Anyaoku led a humble, hard-working life until he succumbed to the temptation of quick money in order to help his family.*

Edwin Anyaoku ("Edwin" or "Mr. Anyaoku") was born in Ojoto, Anambra State, Nigeria, as the youngest of nine siblings. He is 54 years old. PSR ¶ 50. His parents worked tirelessly at modest-paying jobs to support their nine children. *Id.* Mr. Anyaoku dropped out of high school because he was struggling academically and wanted to start helping the family earn money by working at his mother's restaurant. PSR ¶ 51. After working for the restaurant for a few years, Mr. Anyaoku moved to

Nigeria's capital, Lagos, in order to pursue more gainful employment.[3]  He was only in Lagos for a few months before immigrating to Johannesburg, South Africa in 1993. *Id*.  Apartheid had just ended in South Africa and Mr. Anyaoku was hopeful about his employment prospects.

In South Africa, Mr. Anyaoku did his best to make a living by buying and selling used clothes.  He found community with other Nigerians from his area, who also moved to South Africa for a better life.  *See* Letter of Mark Uchenna.  Within a few years, Mr. Anyaoku met and married Audrey Matabula, a native South African. PSR ¶ 52.[4]  Together, they have four daughters, who range in age from 6 to 22 years old.  *Id*.  Having not completed high school and possessing no formal skilled training, Mr. Anyaoku struggled to develop a profitable career.  For the past several years, he has co-owned a gaming store, but as described below, profits from the store are no longer available to his family.  PSR ¶ 60.

2. *Mr. Anyaoku was the primary financial provider for his family, and his incarceration has had a lasting, detrimental impact on his family.*

Edwin and his wife, Audrey, bought a modest house in 2006 in order to provide a stable residence and proper home life for their children.  Before Edwin's arrest, they

---

[3] In the 1980s and 1990s, Nigeria was experiencing an economic depression as a result of years of political turmoil, which caused a fuel shortage and a malfunctioning electrical grid.  The unemployment rate was as high as 25%.  *See* "Corruption Flourished In Abacha's Regime" (1998), James Rupert, *Washington Post*, available at https://www.washingtonpost.com/archive/politics/1998/06/09/corruption-flourished-in-abachas-regime/a995b277-125d-4837-91e0-176197443b9d/

[4] Approximately ten years after marrying Audrey, Mr. Anyaoku became a South African citizen.

were paying 9800 Rand (approximately $530 USD) a month towards the mortgage and mortgage insurance.  The profits from Edwin's job at the jointly-owned gaming store all went towards the mortgage payments.  Since Edwin's arrest, his wife has struggled to cover the housing costs because the co-owner of the store has shared no proceeds from the store to Edwin's wife, even though the store is still jointly-owned.  Ms. Anyaoku does not have enough money to pay her mortgage, let alone hire an attorney to pursue litigation against the co-owner of the store.

Now, the family's sources of income are limited to Audrey's work as an in-home nail technician and their 22-year old daughter's job at a pharmacy.  The only relief from monthly payments that Audrey was able to negotiate was a 1600 Rand (approximately $105 USD) reduction in the mortgage insurance.  In January, Audrey was notified that the bank has put the mortgage under review for a period of 12 months and if any monthly payments are missed, they will repossess it.  Naturally, this is a source of great stress for Mr. Anyaoku's family.

Additionally, because the public school system in Johannesburg requires minimum tuition payments, last fall, the Anyaokus' youngest daughter had to stop attending school because Audrey could not afford the payments.  Audrey applied for tuition exemptions for her other two school-age daughters, so that they could continue in school.

3. *Mr. Anyaoku's friends and family consistently describe him as a generous God-fearing man, whom they will welcome home with open and supportive arms.*

Mr. Anyaoku has not only stretched his meager earnings to provide for his immediate family in South Africa, he is also a caregiver to his extended family.

6

Edwin's older brother, Benjamin, summarizes Edwin's support: "He provided for our parents when they were alive and came home specially [sic] to see our aged mother. He made sure she lacked nothing and sent money for her food and hospital bills.  He also paid school fees for some of our nephews."  Letter of Benjamin Anyaoku.  One of his sisters says, "charity is his hobby," and a nephew describes Edwin offering to defer his own daughter's admission to school in order for Edwin to pay for some of his nephew's advanced schooling.  *See* Letters of Patience Anichebe and Akubukor Chinenye.

Edwin's charity does not just extend to his family.  He and Audrey are devoted parishioners of the Johannesburg-based Grace Place Church, where they attend services and participate in service projects around Johannesburg. *See* photos attached as Exhibit 3.  The church community know Edwin to be a humble man of integrity.  For example, one of the lead pastors, who is affectionately known as "Pastor Mark," writes that Edwin "would often attend church functions, over and above church services and we know him to be a quiet, kind and gentle person. . ." Letter of Mark Fletcher.  Other members of their church community write, "We've known Edwin to be sincere, honest[,] trustworthy and humble."  Letter of Gert and Noele Botha.  Another churchgoer writes, "I believe Edwin Anyaoku is an upstanding citizen and a God-fearing man. . ."  Letter of Charlene Nitsme.  Despite being incarcerated thousands of miles from home, Edwin has applied the good character and work ethic that his friends and family fondly describe here in the U.S.  While detained at the Alexandria Detention Center, he has earned a job in the kitchen and

regularly attends church and discipleship services. *See* Letter of Collin O'Bryan, attached as Exhibit 4.

As the letters submitted demonstrate, the Grace Place Church community is aware of Mr. Anyaoku's offense and will nonetheless welcome him home when he returns. Indeed, Pastor Mark promises, "[P]lease be assured that we will help the family in any way we can; and once Edwin has returned, we will welcome him back and continue with the process of restoration in his life." Letter of Mark Fletcher. Mr. Anyaoku's community, comprised of family members and his religious community, will support him when he returns and will be the guardrails preventing him from ever losing his way again.

**B.     The nature and circumstances of the offense support a variant sentence because Mr. Anyaoku committed the offense at the behest of a government agent and he had not previously imported drugs or ever had the intent to import drugs to the United States.**

In December 2018, the DEA, which was attempting to make inroads into the South African drug trade, made contact with a known drug trafficker, "Tony," a Nigerian national living in Belgium. Tony and Mr. Anyaoku are childhood friends because they grew up in the same village in Nigeria. When a CS, working for the DEA and posing as a drug trafficker, asked Tony about a connection in South Africa, Tony suggested his childhood friend, Edwin Anyaoku. Tony trusted Edwin and he would have known that Edwin was well-connected in the tight-knit Nigerian community living in Johannesburg. The trust was mutual: Edwin also trusted Tony because of their shared history. Tony told Mr. Anyaoku that a friend would be calling, and that Mr. Anyaoku and Tony stood to make a lot of money. It would be easy, Tony

explained, all Edwin would have to do is follow his instructions.  By the time the CS contacted Mr. Anyaoku, he was expecting the call.  After some back and forth, the CS and Mr. Anyaoku struck a deal, whereby Mr. Anyaoku would supply one kilogram of heroin to the CS in exchange for $15,000.  If this sale went well, the CS promised that Mr. Anyaoku could make a lot more money.  Under the story devised by the DEA agents, Mr. Anyaoku's friend Tony stood to make a cut too.  It should be noted that the CS also stood to benefit from a successful deal; while the government did not disclose the specific benefits this CS received for his work in this case, confidential sources are typically rewarded in cash payments or leniency in their own criminal cases.

After the CS and Edwin agreed to the one kilogram sale, the CS suggested that some drugs would be sold in New York.  Specifically, the CS told Mr. Anyaoku that if the first deal went well, he would want more heroin, which would be sent to New York, and that he would pay Mr. Anyaoku $60,000 per kilogram.  For Mr. Anyaoku, who brought home a few hundred dollars a month and who could barely afford his monthly mortgage, this sum was staggering.  He knew that even though he would have to pay Tony's supplier, he could make $1,000 or more off the exchange rate.  This could be enough to pay his family's mortgage for months.  There is no question that Mr. Anyaoku assented to the plan suggested by the CS.  In December, 2017, the two met in Johannesburg and exchanged 1 kilogram for $15,000.  He has lived with this terrible decision every day for almost two years.

In his conversations with the CS—all of which were recorded—Mr. Anyaoku pretended that he was more sophisticated about the drug trade than he really was. In truth, he was being fed information about how to act and what to say by his childhood friend, Tony.  For example, Mr. Anyaoku claimed he had a brother who was incarcerated in Peru for drug trafficking.  This is provably false.  He claimed that he traveled regularly to Brazil.  This is also provably false.  Indeed, his family has taken only two vacations in twenty years—one to a neighboring country, Mozambique, and one to a beach within South Africa.  He also claimed to have a nephew in New York who could pick up money for him and insinuated that his nephew was in on the deal. This was also provably false.  While Mr. Anyaoku has a nephew in New York, his nephew, Jonathan Okoye, is gainfully employed as a Director of Public Safety.  Mr. Okoye had *no idea* that Mr. Anyaoku had implicated him in a drug trafficking scheme.  In fact, Mr. Okoye, has submitted a character letter in support of Mr. Anyaoku, in which he writes, "Uncle Edwin has never discussed any of his alleged drug deal he has in America with me and I have never been involved in any drug deal with him or anyone else."  Letter of Jonathan Okoye.  Likewise, Mr. Anyaoku pretended that he understood the quality of heroin, but he did not.  By all accounts, he was not a drug user or heavily involved in the drug trade.  Tony—who stood to make a cut of the profits—orchestrated the deal.  He told Mr. Anyaoku what to do and what to say.  Tony also connected Mr. Anyaoku to the larger heroin supplier.  Mr. Anyaoku supplied nothing of value to the deal proposed by the CS; everything required came from Tony.  The attorney who represented Mr. Anyaoku in the

extradition process put it perfectly when he said: "he has never before been involved in the drug trade in any way whatsoever . . . . he is a small cog in the wheel.  He was used by somebody else."[5]

On June 18, 2018, after a series of conversations with the CS in which the CS promised that Mr. Anyaoku would make a lot of money, Mr. Anyaoku showed up at a Johannesburg hotel with a female accomplice he had enlisted to help him,[6] and two suitcases of heroin (a total of 29 kilograms).  Of course, as was the plan all along, as soon as he arrived at the designated hotel room, he was arrested and taken into custody. Mr. Anyaoku spent one year in Sun City Jail awaiting extradition.

### III.   A 24-month sentence is supported by other factors present in   this case.

### A.   Mr. Anyaoku is eligible for the 18 U.S.C. § 3553(f) safety valve.

It is undisputed that Mr. Anyaoku qualifies for the § 3553(f) safety valve under the recently enacted First Step Act.  *See* PSR ¶ 32.  Accordingly, this Court may disregard the applicable mandatory minimum and sentence him pursuant to the advisory Sentencing Guidelines and other considerations of § 3553(a).  Congress created the "safety valve" in 1994 to mitigate the harsh effects of mandatory minimum sentences on offenders who played a small role in drug conspiracies.  The recently enacted First Step Act expanded the category of defendants who qualify for

---

[5] *See* Video of Cliff Alexander, Sentencing Mitigation Video, submitted as Exhibit 2.

[6] Two individuals were arrested and charged with Mr. Anyaoku.  According to Cliff Alexander, who represented Mr. Anyaoku through the extradition process and who has familiarity with the case, one of those cases was dismissed for lack of evidence and the female accomplice was acquitted after a trial. Neither were extradited to the United States.

safety valve, though Mr. Anyaoku would have qualified regardless because he has no prior criminal history whatsoever.

This case epitomizes why Congress enacted the safety valve, to ensure that mandatory sentences are not imposed on low-level, non-violent, first-time offenders. Mr. Anyaoku is a financially struggling citizen of South Africa. He was encouraged to commit the offense by his trusted childhood friend, Tony, and he committed the crime at the behest of a government agent. He has no prior convictions or known ties to international drug traffickers, other than Tony. He debriefed with the government and proffered all that he knows about the offense, which is admittedly little due to his brief and limited involvement.

Because Mr. Anyaoku is a small-time player in the drug trade, it is unlikely that he will qualify for a significant reduction based on his substantial assistance to the government. As such, he is precisely the type of defendant who should benefit from a significant variance pursuant to safety valve. *See United States v. Warren*, 338 F.3d 258, 264 (3d Cir. 2003) ("[T]he purpose of the [safety valve] provision was 'to remedy an inequity in the Guidelines whereby more senior operatives could obtain lighter sentences than less culpable lower-level operatives because the former had more information to offer than the latter and so could benefit from the Substantial Assistance downward departure. . . .'") (quoting *United States v. Washman*, 128 F.3d 1305, 1307 (9th Cir. 1997)). "Ironically, [] for the very offenders who most warrant proportionally lower sentences - offenders that by guideline definitions are the least culpable - mandatory minimums generally operate to block the sentence from

reflecting mitigating factors." *United States v. Sherpa*, 110 F.3d 656, 660 (9th Cir. 1996) (quoting H.R. Rep. No. 103-460, 103d Cong., 2d Sess. (1994)).

**B.** **The Court should afford the drug trafficking guideline, USSG § 2D1.1, less weight because it is disproportionately based on drug type and quantity and has little correlation to Mr. Anyaoku's culpability.**

This case illustrates the arbitrary results produced by USSG 2D1.1's overemphasis on drug quantity and type: because no aggravating enhancements apply here, Mr. Anyaoku's guideline range is predicated solely on the quantity of heroin at issue in this case—a quantity that was driven by the CS and a quantity that was never going to make it to the U.S. in the first place. Under 2D1.1.'s Drug Quantity Table, Mr. Anyaoku's base offense level is 36 because, at the CS's request, he produced a total of 30 kilograms, resulting in an overall guideline range after adjustments of 108 to 135 months. *See* PSR ¶¶ 32-41. However, the threshold for a base offense level 36 is 30 kilograms ***exactly***. If he had produced just *one kilogram less* (29 kilograms) his base offense level would be 34, resulting in a significantly lower overall guideline range of 87 to 108 months. As is the case here, the guideline's reliance on drug type and quantity has been repeatedly shown to have little correlation to an individual's culpability, and as a result, sentencing courts more often than not deviate downward. *See, e.g.*, *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013) (outlining policy disagreement with methamphetamine guidelines and imposing a 75 month sentence, <u>93 months below</u> the low end of the guideline range). Because § 2D1.1's type- and quantity-based approach functions as a "poor prox[y] for culpability," *id.* at 1028, this Court has the discretion to reject or vary from

it.  *See, e.g., Spears v. United States*, 555 U.S. 261, 265-66 (2009) (district courts are entitled to reject or vary from the Guidelines based on policy disagreements).  In fact, the Court may vary from the Guidelines "even in a mine-run case," and "not simply based on an individualized determination that they yield an excessive sentence in a particular case."  *Id*. at 264-65.

As one judge put it: the "drug trafficking guideline [§ 2D1.1] was *born* broken." *United States v. Diaz*, No. 11-CR-00821-2, 2013 WL 322243, at *9 (E.D.N.Y. Jan. 28, 2013).   Although Congress originally intended the mandatory minimums to correspond to the roles of various offenders—5 years for managers and 10 years for organizers and leaders, *id*. at *4 n.34—the resulting statutes were instead tied to the type of drug and its quantity.  *See id*. at *5.  To avoid Guidelines ranges that were inconsistent with the mandatory minimum, the Sentencing Commission created a tiered system based on drug quantity.  *See id*. at *6.  In short, in drug trafficking cases, the Guidelines recommend sentences tied not to any sound sentencing data but to arbitrary numbers set by Congress for the mandatory minimums.

In sum, the drug type and quantity-based approach of § 2D1.1 is "fundamentally flawed because [it] fail[s] to consider additional factors beyond quantity." *Hayes*, 948 F. Supp. 2d at 1029.   In Mr. Anyaoku's case, this problem could not be more stark. His base offense level is driven by a drug quantity created by the CS that had no potential of harming U.S. customers.  Meanwhile, he is not a leader or organizer—let alone a regular player—in drug trafficking.  Accordingly, the defense submits that

this Court should afford the advisory Guidelines range substantially less weight than usual in the balance of § 3553(a) factors.

**C.     A downward variance is warranted because Mr. Anyaoku was "imperfectly entrapped" into the conspiracy.**

Prior to *Booker*, imperfect entrapment was an established grounds for departure under 5K2.12, which applied when a government agent's conduct did not constitute entrapment in a legal sense but where the agent's conduct "influenced the defendant['s] decision[] to play a pivotal role." *See, e.g., United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993) (internal citations omitted); *United States v. Way*, 103 Fed. Appx. 716 (4th Cir. 2004) (recognizing imperfect entrapment as a basis for departure).

Both entrapment and imperfect entrapment share the feature that the government is the "but-for" cause of the criminal activity. What differentiates the two is that with actual legal entrapment, the defendant's will is effectively overborne, while imperfect entrapment applies where the defendant is willing and able to engage in the criminal conduct, but simply would not have but for the government agent—in the instant case, the CS, who was posing a drug trafficker. *See United States v. McClelland*, 72 F.3d 717, 725-26 (9th Cir. 1995) (district court properly departed downward six levels for imperfect entrapment even though defendant had initiated the plan).

The undersigned acknowledges that this is not an entrapment case. When the opportunity arose to make quick and easy money by working with the CS, Mr. Anyaoku chose to make the deal, freely and voluntarily. What makes his defense

"imperfect" is that he did not seek out the deal—the deal came to him by way of a trusted childhood friend and a person working for the DEA, both of whom stood to benefit from enticing Mr. Anyaoku into making a deal.

Mr. Anyaoku is 54 years old.  Prior to meeting the CS, he had never been involved in a situation like this one.  There is no evidence that before Tony mentioned his name, Mr. Anyaoku was ever even investigated for drug trafficking.  It was only after the CS promised easy money that Mr. Anyaoku, who was financially struggling with four children to feed, became involved in this offense.  The undersigned submits that a significant below-guidelines variance is appropriate in this case because the DEA's CS was a "but-for" cause of Mr. Anyaoku's offense conduct—conduct for which he has already been amply punished, and in which he had never before engaged.

**C.    A 24-month sentence is warranted because Mr. Anyaoku was incarcerated in one of South Africa's worst prisons awaiting extradition, which he did not challenge.**

Following his arrest in June 2018, Mr. Anyaoku was detained for one year in Johannesburg Correctional Centre, known as "Sun City" prison, awaiting extradition, which he did not challenge.  The euphemistically named "Sun City" prison is considered the second most dangerous prison in South Africa.[7]  Sun City is a maximum security prison that houses over 2,500 inmates, including both pre-trial and sentenced inmates.  The conditions are horrific.  Cells that are meant for 20 people house 100 people, resulting in many inmates not having their own beds.[8]

---

[7] Affidavit of Colin Kirkpatrick, attached as Exhibit 5, at 2.  *See also* video of Cliff Alexander, submitted as Exhibit 2.

[8] *Id.*

Food is scarce.  There is a shortage of inmate uniforms, blankets, toilet paper and health and rehabilitative services.[9]  In perhaps the most appalling example of the horrible and unsanitary conditions, it is widely reported (and Mr. Anyaoku confirms) that overflowing buckets are routinely used as toilets for dozens of men.

Mr. Anyaoku spent 367 days in these horrific conditions before he was extradited to the United States on the instant charges.  When he landed in the U.S. in June 2019, in the custody of the U.S. Marshals, it was the first time that Mr. Anyaoku had ever set foot on U.S. soil.  Because of the 12 months of brutal conditions to which Mr. Anyaoku was subjected, the defense submits he should be awarded a downward variance of 48 months from the appropriate sentence under 3553(a).  Thus, if the Court reasons that a 60-month sentence is appropriate under 3553(a), then the Court should sentence Mr. Anyaoku to 24 months.

## IV. A sentence of 24 months, in conjunction with the 367 days in the Sun City Prison, will achieve the goals of sentencing.

## A. One year in Sun City Prison and two years in BOP custody is a just punishment.

The undersigned has described the appalling conditions in the Sun City Prison. In considering Mr. Anyaoku's time in BOP custody, the defense asks the Court to consider that, as a South African national far from home, Mr. Anyaoku's time in prison will be even more punitive than it is for other inmates.  He is unlikely to find

---

[9] *See* Sun City Inmates Cry Foul Over Alleged Mistreatment, Overcrowding, *The Citizen*, 20 December 2018, available at https://citizen.co.za/news/south-africa/general/2051933/sun-city-inmates-cry-foul-over-alleged-mistreatment-overcrowding/.

a community of South Africans with whom to connect.  There is no one—save for his nephew who lives in New York—who can visit him.  Unlike other inmates, he will not be able to see his beloved wife and children, even through a plexiglass window. Further, his status as a deportable alien will make his time in BOP custody significantly more difficult.  First, although Mr. Anyaoku has no criminal history, he is barred from assignment to a minimum security prison because of his status.[10]  For the same reason, Mr. Anyaoku will only be eligible to participate in occupational education programs if BOP "resources permit after meeting the needs of other eligible inmates," which is almost certain not to occur.[11]  Finally, as a deportable alien, Mr. Anyaoku is ineligible for early release to a halfway house or other community confinement.[12]

A total of one year in Sun City prison and additional time in BOP prison—each with its own uniquely punitive conditions for Mr. Anyaoku—is a "just punishment" for Mr. Anyaoku's offense, which he would not have committed but for the invitation from his childhood friend and the CS.  This is especially true because while **after** he met the CS, he showed a willingness to assist in causing drugs to be brought to the

---

[10] Federal Bureau of Prisons Program Statement 5100.08:  Inmate Security Designation and Custody Classification, Ch.5, p.9.  (Sept. 12, 2006).  Available at https://www.bop.gov/policy/progstat/5100_008.pdf.

[11] Federal Bureau of Prisons, Program Statement 5353.01: Occupational Education Programs, at 3 (Dec. 17, 2003).  Available at https://www.bop.gov/policy/progstat/5353_001.pdf

[12] *Lartey v. U.S. Dep't of Justice*, 790 F. Supp. 130, 133 (W.D. La. 1992) (noting that 18 U.S.C. § 3624(c), which directs release to halfway houses at the end of a prison term, does not apply to deportable aliens).

U.S., Mr. Anyaoku had never before imported drugs to the U.S., nor had he shown any inclination, never mind ability, to do so.  As such, his offense did not cause U.S. citizens actual or even likely harm.

## B.   One year in Sun City Prison and two years in BOP custody will deter Mr. Anyaoku and others.

The time that Mr. Anyaoku has already spent separated from his family, thousands of miles from home, is more than enough to deter him from re-offending. Furthermore, he lives with the shame of knowing that he devastated his family.  For Mr. Anyaoku, that shame is a punishment far more impactful than any prison sentence the Court could impose.  In his absence, the bank is threatening to foreclose on his home.  That his bad judgment had such devastating impact on his own children—the very people he misguidedly wanted to help by making quick money— will be a constant reminder to never again try to make money the wrong way, no matter how dire his circumstances.  His nephew, who visited Mr. Anyaoku in the Alexandria Detention Center observed, "I saw was a broken man that was disappointed in himself and too embarrassed to steadily look into my eyes." Letter of Jonathan Okoye.  Mr. Anyaoku's profound remorse is reflected not only in his private conversations with family, but in his actions.  As Mark Uchenna describes, after a mix-up in court, South African security forces mistakenly processed Edwin to be released until *he* informed *them* that they made a mistake.  Mr. Uchenna adds, "he also refused to fight or contest his extradition to the United States as he is one person that believes in justice."  Letter of Mark Uchenna.

Furthermore, there is no risk of recidivism in this case given the harsh lesson Mr. Anyaoku has already learned, especially in light of his age. Statistical data from a study by the United States Sentencing Commission show that "[r]ecidivism rates decline relatively consistently as age increases."[13] The study indicates that a defendant over the age of 50 in criminal history category I has a 6.2 percent likelihood of recidivating.[14] Mr. Anyaoku is 54 years old. He will be at least 56 by the time he returns home. While he will in no way be an old man, his status as a first offender at over fifty years old make him exceedingly unlikely to reoffend.

A sentence of *any* period of incarceration in both Sun City prison and American prison, will serve as a clarion warning to other potential drug dealers. Indeed, it is well-recognized that the most effective deterrent is the certainty of punishment, rather than its length.[15]

## C.   The requested sentence will serve Mr. Anyaoku's rehabilitation.

Finally, Mr. Anyaoku has a strong community of friends and family in Johannesburg and his hometown in Nigeria, that will welcome him home with open arms, comfort him, and provide the support he needs to get back on his feet. To the extent that he needs rehabilitation, Mr. Anyaoku will find that in his continuing faith, his church community, and the many people that will surround him when he

---

[13] U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, found at: https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines

[14] *Id.* at 9.

[15] *See, e.g.*, Nat'l Resource Council, The Growth of Incarceration in the United States, at 131 (2014).

returns to South Africa.  In light of what he has been through and in light of the wealth of support he has when he returns to South Africa, there is zero chance that Mr. Anyaoku will ever re-offend.  Under these circumstances—and where no harm was directly inflicted upon anyone in the United States and where Mr. Anyaoku will be deported and never able to return to the United States—a sentence of two years in BOP custody is more than sufficient to meet the goals of sentencing.


Respectfully submitted,

EDWIN ANYAOKU
By counsel,

Geremy C. Kamens
Federal Public Defender


_____

Elizabeth Mullin
Va. Bar No. 86668
Assistant Federal Public Defenders
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
703-600-0800 (tel)
703-600-0880 (fax)
Elizabeth_Mullin@fd.org (email)

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2020, I will electronically file the foregoing with the Clerk of court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Katherine Rumbaugh
> United States Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, VA   22314

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the forgoing pleading will be delivered to Chambers within one business day of the electronic filing.

_____/s/_____

Elizabeth Mullin
Virginia Bar No. 86668
Attorney for Defendant
